PROGRAM AND CONSTRUCTION
MANAGEMENT GROUP,
INC., Appellant,

v.

Thurman M. DAVIS, Sr., Acting
Administrator, General Services
Administration, Appellee.

No. 00–1312.

United States Court of Appeals,
Federal Circuit.

April 19, 2001.

Leonard A. White, of Bethesda, Maryland, argued for appellant. With him on the brief was Elizabeth D. Horton.

Franklin E. White, Jr., Trail Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were David M. Cohen, Director; and Donald E. Kinner, Assistant Director. Of counsel was Ruth Kowarski, Attorney, General Services Administration, of Washington, DC.

Before PAULINE NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and LINN, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The principal question is whether the General Services Administration Board of Contract Appeals (Board) correctly interpreted a contract to upgrade the heating, ventilation and air conditioning of the cafeteria and kitchen in a government building as contemplating that the cafeteria would remain open during the performance of the contract. We affirm that ruling and also the Board's rejection of the other grounds on which the contractor sought additional compensation, *i.e.,* that the government was responsible for various delays in the performance of the contract.

I

The basic facts are undisputed. The General Services Administration contracted with the appellant Program and Construction Management Group, Inc. (Contractor) to upgrade the heating, ventilation and air conditioning of the cafeteria, kitchen and other facilities in a government building, for a fixed-price of $747,267. The contract had been set aside for a small business under 48 C.F.R. Subpart 19.5 and resulted from negotiations. The government instituted the procurement by issuing a solicitation which, after various amendments, became the contract.

The solicitation stated at least three times that the building would remain open and occupied during the work. It pointed out that "[t]he Government will occupy the site and the existing building during the entire period of construction" (Section 01010, clause 1.4), that "[t]he premises will be occupied during performance of work under the contract" (Section 1040, clause 1.5), and that "[t]he building shall remain in operation during the work of this contract" (Note to architectural drawing 3–1A). The last note also stated: "[t]he hours of operation allowed for the contractor's work in occupied areas is indicated in the specifications."

Section 1040, clause 1.5, captioned "LIMITATIONS FOR USE OF SITE," stated:

H. Unless noted otherwise, all work in Mechanical Equipment Rooms may be done during standard business hours. In Kitchen, serving line areas and dining area, all work shall be done between 2:00 pm and 5:00 am on week nights and from 2:00 pm Friday to 5:00 am Monday.

I. Standard building hours are 6:30 a.m. to 6:30 p.m., Monday through Friday. . . .

M. Existing Equipment on Site: Cover equipment that is to remain in place within the area of contract operations and protect it against damage or loss. . . . In addition, dining tables, chairs and service equipment shall be wiped clean of debris after the conclusion of every work day before 5:00 am.

Note 8 to architectural drawing 9–M–1 initially stated:

The cafeteria, dining area, kitchen and serving line shall remain in operation during the work of this contract. Be-

fore work begins the contractor shall submit a plan to provide temporary ventilation, cooling or heating, as required to maintain indoor temperatures of 80 degrees F in the cooling season and 65 degrees F in the heating season. The kitchen cooling season indoor temperature shall be maintained at 85 degrees Fahrenheit maximum.

During discussions with the Contractor, the government decided to eliminate the requirement for temporary heating or cooling until the contract was awarded and it could be determined whether that action would be necessary. The government issued Amendment 01 to the solicitation, effective February 16, 1994, which included the statement:

Delete in its entirety General Note 8, on drawing 9–M–1.

The contract required the Contractor to "commence work under the contract within [a] calendar day after the contractor receives the notice to proceed and to complete the work within 180 days after receipt of the notice to proceed." Section 00800–1. The Contractor received the notice to proceed on December 8, 1995, and the government deemed the work substantially completed on October 17, 1996, more than 300 days later.

The Contractor submitted to the contracting officer a claim of $405,468 for a variety of costs attributed to delay or work changes that the government caused. The Contractor also sought damages based on its additional costs allegedly incurred because the cafeteria and kitchen were kept open during construction.

After the contracting officer denied the claims, the Contractor appealed to the Board, which also rejected them all. After an evidentiary hearing, the Board interpreted the contract as contemplating that the cafeteria would remain open during the performance of the contract. It stated:

Reading this contract as a whole, it is clear that the building, including the work areas, would be occupied and the hours when the contractor could work in occupied areas would be restricted.... Construing the contract, including amendment 1, as a whole, we conclude that GSA did not intend to close the cafeteria for the duration of this project, and the contract did not do so.... The contract did not state or imply that the cafeteria would be closed.

*Program and Constr. Mgmt. Group, Inc. v. Gen. Servs. Admin.*, No. GSBCA 14178, 14557, slip op. at 27–28 (G.S.B.C.A. Dec. 30, 1999) (Board decision).

The Board concluded that the Contractor was "not entitled to any further compensation from GSA for added costs associated with changed work or delays encountered in the performance of this contract. Most of the delays claimed by [the Contractor] were attributable to its faulty understanding of the contract terms.... To the extent that GSA changed work, or caused delays that did not run concurrently with [the Contractor]-caused delay, it has fully compensated [the Contractor] under change orders to the contract." Board decision, slip op. at 33.

## II

■ The Contractor contends that because Note 8 to the drawing was the only provision of the contract that explicitly stated that the cafeteria would remain open during performance of the contract, the deletion of that provision meant that

the contract no longer so provided. We agree with the Board, however, that viewing the contract as a whole, it contemplated that the cafeteria would remain open during the work. "[I]n view of the Board's considerable experience and expertise in interpreting government contracts, its interpretation is given careful consideration." *Interstate Gen. Gov't Contractors v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir. 1992) (quoting *Triax–Pacific, A Joint Venture v. Stone,* 958 F.2d 351, 353 (Fed.Cir. 1992)).

In three different places, the contract stated that the government would continue to occupy and operate the building during contract performance. The contract also sharply distinguished between the hours when the work could be done in the building generally and the more limited periods it could be done in the cafeteria area. It provided that work in mechanical equipment rooms could be done "during standard business hours," which it defined as "6:30 a.m. to 6:30 p.m., Monday through Friday." In the cafeteria area, however, "all work shall be done between 2:00 pm and 5:00 am on week nights and from 2:00 pm Friday to 5:00 am Monday." It also provided that "dining tables, chairs and service equipment shall be wiped clean of debris after the conclusion of every work day before 5:00 am."

These provisions would make little sense and serve no reasonable purpose unless the cafeteria would remain open. They were designed to ensure that no work would be done while the cafeteria was operating—to prepare and serve food and clean up afterward—between 5:00 a.m. and 2:00 p.m. on weekdays. These restrictions did not apply on weekends, when the cafeteria would be closed. The Contractor also was required to insure that the tables, chairs and service equipment in the cafeteria area were wiped clean of debris after the end of every weekday workday before 5:00 a.m., thereby insuring that the cafeteria would be clean and thus ready for operation every weekday morning.

The deletion of the statement in Note 8 that the "cafeteria, dining area, kitchen and serving line shall remain in operation during the work of the contract" does not outweigh or refute the foregoing indications in the contract that the cafeteria would remain open. Even without that statement, nothing in this contract indicates that the cafeteria would be closed during the work. To the contrary, as we have shown, the contract indicates that the cafeteria would remain open. Moreover, there is nothing unfair to the Contractor in so interpreting the contract, since after Note 8 was deleted but before the contract was signed, government officials told the Contractor, as the Board found, that the cafeteria would remain open.

Although we sustain the government's interpretation of the contract, we do not approve or condone certain aspects of the government's handling of this matter. The government initially believed it important to state explicitly that the cafeteria would remain open, yet the provision so stating was not included in the text of the contract. Instead, it was the first sentence of Note 8 on one of the architectural drawings, which was followed by two other sentences dealing with the temporary heating and cooling of the cafeteria area during the work. When the government decided to eliminate initially the latter requirement, it did not merely delete the last two sentences of Note 8, as one would expect it to have done. Instead, it deleted Note 8 "in its entirety," thereby also deleting the statement that the cafeteria would

remain open, even though the government did not intend to change that situation.

One would hope that the government would be more careful in dealing with its contractors and avoid the kind of sloppiness and errors that characterized its actions here. This is particularly so in dealing with small businesses (like the Contractor), who may lack knowledge of the subtleties and problems sometimes encountered in government contracts.

### III

The Contractor's two other claims both relate to the government's alleged responsibility for delays in the performance of the contract. The Board correctly and convincingly rejected these claims, and we need not address them at length.

■ The Contractor first complains that the government did not schedule a preconstruction meeting shortly after issuing the notice to proceed, but instead waited forty-six days before holding one. It asserts that it could not proceed with the work until such meeting was held. Nothing in the contract, however, required a preconstruction meeting. As the Board explained:

> Regardless of whether there is an industry custom to hold a meeting shortly after the issuance of the notice to proceed, ... a preconstruction meeting is *not* a prerequisite to the start of work. If the contractor believes a preconstruction meeting is necessary, it should undertake to initiate the process by contacting the contracting officer or other individual designated by the agent to interface with the contractor. The lapse of time between the issuance of the notice to proceed and the convening of a

preconstruction conference does not establish compensable delay to the contractor. GSA is not responsible for [the contractor's] erroneous impression that a preconstruction meeting was required to be scheduled by GSA before [the Contractor] could start work at the site. Nothing prevented [the Contractor] from initiating the process itself by promptly submitting its accident prevention plan as it was required to do under the contract [and did not do until after the preconstruction meeting was held.]

Board decision, slip op. at 25.

■ The Contractor also seeks compensation for delay resulting from the government's amendment of the contract to provide for temporary heating and cooling. The Board responded:

> The change orders for this task compensated [the Contractor] for all costs resulting from installation of temporary [heating or cooling], including impact and delay, and operated to absorb overhead that might otherwise have been unabsorbed under Government-caused delay of the work.... The modifications agreed to with respect to this work fully compensated [the Contractor] for any delay associated with this issue.

Board decision, slip op. at 26–27 (footnote deleted).

### CONCLUSION

The decision of the General Services Administration Board of Contracts Appeals is

*AFFIRMED.*